TOWNSHIP OF JACKSON, IN THE COUNTY OF OCEAN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ALLIED ORDNANCE, A CORPORATION OF THE STATE OF NEW JERSEY, DOING BUSINESS AS OAK TREE MOBILE HOME PARK AND MICHAEL FORMISANO, PRESIDENT, DEFENDANTS-APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued December 12, 1977—Decided February 7, 1978.

(1)

Before Judges ALLCORN, MORGAN and HORN.

*Mr. Ruben D. Silverman* argued the cause for appellants (*Messrs. Silverman & Silverman,* attorneys).

*Mr. Joseph F. Martone* argued the cause for respondent.

The opinion of the court was delivered by

ALLCORN, P. J. A. D. It is no longer open to question in this State that a license fee or tax may be imposed by a municipality for each space or pad occupied in a trailer camp or mobile home park, and that such fee or tax may be imposed for revenue, as well as for regulatory purposes. *N. J. S. A.* 40:52-1, 2; *Nelson Cooney & Son, Inc. v. So. Harrison Tp.*, 57 *N. J.* 384 (1971); *Bellington v. East Windsor Tp.*, 17 *N. J.* 558 (1955).

Founded upon the proposition that mobile homes sited in a mobile home park and their occupants require the widest range of community facilities and services—essentially the same in nature and extent as those needed by dwellings permanently affixed to the land and their occupants; that such mobile homes do not contribute their fair share of the cost of local government which establishes, maintains and operates said facilities and services because of the lack of authority of local government to otherwise exact such contribution by way of personal property tax or of real property tax on an *ad valorem* basis, it is recognized that in the absence of a fair and equitable contribution toward the cost of local government by the mobile home owner the establishment and operation of a mobile home park thereby casts a unique burden or special impact upon the affected local government obligated to make available and to supply the facilities and services so required. *Cooney, supra; Bellington, supra; Manhattan Trailer Ct. v. N. Bergen Tp.*, 104 *N. J. Super.* 405 (App. Div. 1969); Note, "Towards an equitable and workable program of mobile home taxation," 71 *Yale L. J.* 702 (1962); Annotation, "Taxation as real estate of trailers or mobile homes," 86 *A. L. R.* 2d 277 (1962).

Thus it is that the Legislature in 1948 authorized municipalities to license and to regulate "trailer camps and camp sites," and to fix fees for such licenses "which may be im-

posed for revenue," *N. J. S. A.* 40:52–1(d), *N. J. S. A.* 40:52–2. And our Supreme Court has upheld as valid space or pad fees imposed under the cited statutory authority, so long as the fee fixed is an appropriate sum commensurate with the obligation of the mobile home owner or occupant to pay his fair share of the cost of local government—*i.e.,* a fee in the nature of an assessment equitably proportioned to the total annual revenues required to be raised by the local government for its total costs, including both current municipal and school operating expenses and capital costs, as well as its share of the county budget. As set forth in *Bellington v. East Windsor Tp., supra*:

> * * * The tax concept may be expressed in terms of the shares of the benefits of government to bear its burdens equitably and justly. Trailer camps are peopled in great part by transients who use and enjoy the community's services and facilities without sharing the cost; and the inclusion in the license fee of a tax designed in some measure to equalize the common burden is within the statutory tax for revenue as an incident of the police regulatory power. * * * [at 17 *N. J.* at 567]

The propriety of the sum of such equitable and just share of the cost of local government assessed by license charge may be measured (1) against the amount of the property tax levied for municipal, school and county purposes apportioned *per capita* among the residents of the municipality; (2) against the amount of tax which would be realized by applying the current tax rate to the average value of all trailers in the park, or (3) where the value of the specific services rendered to the trailers and their occupants of the park exceed their *ad valorem* or *per capita* share, against the value of such services. *Cooney, supra,* 57 *N. J.* at 394–395.

Defendant Allied Ordnance owns and operates a mobile home park within plaintiff municipality. The use of the park is restricted to mobile homes occupied by "senior citizens." During the year 1974, the only year for which complete figures were supplied, the park contained 258 trailer

pads, the trailers being occupied by 506 persons. The pad fee imposed by plaintiff was at the rate of $2.50 a week or an aggregate of $130 for the year, for each pad.[1] The pad fee subsequently was reduced (1975) and ultimately repealed (1976).

The record indicates that the amount received by the municipality from pad fees from the mobile home park during the year 1974 was $23,540. Defendant Allied Ordnance was also assessed and paid, for the year 1974, a real estate tax on the park land and improvements (roads, utility improvements, pads, etc.) in the sum of $28,738.85. In addition, the said park owner paid an annual park license fee of $600. The municipality thus received from the park in the aggregate, for the year 1974, the amount of $62,878.85, in the form of taxes and fees—or $243.72 per pad (at 258 spaces) or $124.27 *per capita* (at 506 occupants).

The record further discloses that, for the year 1974, plaintiff municipality was required to raise the sum of $7,810,668.43 for all purposes, and that the total estimated population for that year was 21,000 persons, exclusive of the residents of mobile home parks.[2] This would average out to a *per capita* tax burden of $371.93 for each person resident within Jackson Township, not including the residents of mobile home parks.

It also appears that the average real estate taxes assessed for the year 1974 for homes valued at $10,000, $20,000 and $30,000 were $568, $947 and $1,325 respectively—or at rates per $100 of valuation ranging from $5.68 to $4.73 to $4.42.[3] At oral argument counsel for defendants conceded that the average value of the trailers occupying this

---

[1] A larger pad fee was imposed on non-senior citizen mobile home parks.

[2] No information is supplied as to the total number or average total number of trailer residents within the municipality.

[3] No explanation appears in the record for the rate discrepancies.

mobile home park amounted to no less than $5,000 per trailer. Consequently, and even without including the value of the land, the pad and other improvements of the park, if an *ad valorem* tax or fee were to be assessed against each trailer, the assessment would amount to $284 (using a rate of $5.68), $236.50 (using a rate of $4.73) and $221 (using a rate of $4.42). As indicated earlier, the average per pad payment actually received by the municipality was $243.72, which compares favorably with the foregoing amounts calculated on an *ad valorem* tax basis.

The *per capita* comparison is even more favorable to the mobile home park dweller: a *per capita* cost to the residents of the municipality occupying conventional dwellings amounting to $371.93, as against a *per capita* cost to each resident of the park amounting to $124.27. Thus, the *per capita* cost to the mobile home dweller was approximately one-third of the *per capita* cost to each conventional home dweller.

In light of the foregoing it is plain that the total contribution here made by the mobile home park and the mobile home occupants, computed on a pro rata pad basis for the year 1974, was no more than their fair share of the cost of local government for that year; computed on a *per capita basis,* it was considerably less. Quite obviously, the pad fee of $2.50 per month was reasonable and valid as to the defendant mobile park owner and as to the mobile home owner or occupant.

The principal thesis of defendants is that the special burden or impact of a mobile home park upon local government is restricted merely to the cost of such of those facilities and services actually utilized by or supplied to the park and its trailers and occupants. Defendants argue that, inasmuch as the park and the mobile homes in 1974 were provided merely and minimal services (14 police calls, 14 ambulance calls, and 2 children in the public schools) at an estimated total cost of $3,000, the special impact or burden on local community facilities and services was *de mini-*

*mis* compared to the aggregate fees and taxes collected from the defendant mobile park owner and the mobile home owners by the municipality. A more complete survey for the year 1975 purported to show that the specific services actually supplied (*i.e.*, police calls, collection of bulky waste items, leaf collection, moth spraying, providing of shopping bus, and health inspections and other services) were computed to cost the municipality a mere $9,000.

The contention is plainly specious. The determinant is not the cost of the specific community facilities and services actually and directly used by or supplied to the mobile home, mobile home occupant and mobile home park, any more than it is or should be the measure of the responsibility of the conventional homeowner for his share of the cost of local government. The argument ignores the fact that the cost of local government is made up of the total monies appropriated and expended for all municipal and county purposes. In short, the special impact or burden of the mobile home park and dwellers upon local government costs is, at the very least, equivalent to the impact of the same number of conventional dwellings having approximately the same value or the same number of occupants. The circumstance that the occupants of either type of home may have no occasion or may choose not to avail themselves of some few or many of the local services and facilities (including schools) is of absolutely no moment in the equitable division and sharing of the cost of local government. *Sheridanville, Inc. v. Wrightstown,* 125 *F. Supp.* 743, 752–753 (D. N. J. 1954), aff'd 225 *F.* 2d 473 (3 Cir. 1955), *cert.* den. 351 *U. S.* 962, 76 *S. Ct.* 1024, 100 *L. Ed.* 1483 (1956). See also, *Bloomfield v. Academy of Med. of N. J.,* 47 *N. J.* 358, 363 (1966); 71 *Am. Jur.* 2d, *State and Local Taxation,* § 7 (1973).

Lastly, defendants urge that the municipality's 1975 reduction of the pad fee and the 1976 repealer of the pad fee as to the senior citizen mobile home parks constitutes proof positive that the senior citizen mobile home parks

had no special impact or burden on the municipality not otherwise covered by the real estate taxes assessed against the land and the improvements of the park and by the general annual license fee imposed for the operation of the park. In light of the above computations setting forth the fair share of the cost of local government attributable to this mobile home park, the mobile homes sited therein and their occupants, the argument is clearly without any merit whatever.

For the foregoing reasons, the judgment of the Law Division is affirmed.